UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

PEARL L. JOHNSON — PLAINTIFF

V. — CIVIL ACTION NO.: 3:07-cv-621-DPJ-FKB

EARL WATKINS, IN HIS CAPACITY AS SUPERINTENDENT OF JACKSON PUBLIC SCHOOL DISTRICTS — DEFENDANT

ORDER

This employment dispute is before the Court on Defendant Jackson Public Schools District's (JPS) Motion for Judgment as a Matter of Law (JMOL) [125] and Motion for New Trial [126]. Having fully considered the parties' submissions and the applicable authority, the Court concludes that JPS is entitled to JMOL on damages. All other relief is denied.

I. Facts/Procedural History

This matter has a long and bitter history that will not be repeated in full. Briefly, JPS hired Plaintiff Pearl Johnson as a literacy coach at Rowan Middle School. During her brief tenure in this position, Johnson claims that she was sexually harassed by Principal Tony Winters, and that Winters and others retaliated against her for complaining of the alleged harassment. In May 2009, this Court partially granted JPS's Motion for Summary Judgment [44] and dismissed Johnson's sexual-harassment claim along with her individual-liability claims against Winters and JPS Superintendent Earl Watkins. Order [65] May 29, 2009. That Order provided a more detailed recitation of facts and is herein incorporated. Johnson's Title VII retaliation claim survived Defendants' Motion and a subsequent Motion for Reconsideration [66] because the issue was not argued in light of *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006). The retaliation claim was then set for trial.

Johnson's counsel withdrew after responding to the initial summary-judgment Motion, leaving Johnson to represent herself. From that date, the case has been arduous and extraordinarily time consuming requiring frequent assistance from the Court. As the matter progressed, it became apparent that Johnson would require some assistance, and in an effort to reduce anticipated challenges at trial, the Court appointed stand-by counsel. Although stand-by counsel performed admirably, Johnson represented herself, and the jury heard a number of improper statements before returning a $50,000 verdict in her favor. The trial lasted four days.

In July 2010, JPS renewed its pre-verdict Motion for JMOL and alternatively sought a new trial. After numerous extensions and other post-trial motions and issues, Johnson filed her Response [165] on February 28, 2011, although it could not be docketed until March 4, 2011, because Johnson accidentally shuffled her papers in the clerk's office and did not immediately return to correct them.[1] The Response contained more than thirty exhibits and other materials that were available but not offered at trial. The Court therefore denied Plaintiff's Motion [166] to include these materials and has not considered Johnson's references to them. The Response also includes new factual assertions that are not supported by the record evidence (or even by the stricken exhibits). These facts were ignored. After exhaustive review of the record and the parties' submissions, the Court is prepared to rule.

---

[1]Plaintiff incorrectly styled her Response as a "motion," but read liberally it is a response and will be referred to as such.

II. Analysis

A. JMOL

"Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)) (other citations omitted). The trial court must "review all of the evidence in the record. . . . In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id*. at 150 (citations omitted). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id*. at 151 (citation omitted). The Court "'will not disturb the jury's verdict unless, considering the evidence in the light most favorable to [the plaintiff], the facts and inferences point so overwhelmingly to [the defendant] that reasonable jurors could not have arrived at a verdict except in [its] favor.'" *Streber v. Hunter*, 221 F.3d 701, 721 (5th Cir. 2000) (quoting *Douglas v. DynMcDermott Petroleum Operations Co*., 144 F.3d 364, 369 (5th Cir. 1998)).

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a) (2006). "There are three elements to a *prima facie* case of retaliation under Title VII: (1) that the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action

occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002) (citation omitted). JPS concedes that Johnson participated in a protected activity but denies she suffered an adverse employment action. JPS also challenges whether Johnson proved a causal connection between the alleged adverse action and her damages, as well as the reasonableness of her damages.

1. Materially Adverse Employment Actions

Johnson testified regarding a number of incidents that occurred during her tenure at Rowan Middle School. Many of the allegations related to petty slights and disagreements with Winters, such as his unwelcome attempt to give Johnson a Christmas card. The parties now dispute the following as alleged acts of retaliation: (1) Winters's alleged assault in December 2006; (2) alleged denial of training in January 2007; (3) alleged denial of privilege to make unannounced visits to classrooms in February 2007; (4) alleged criticism at coaches meeting in February 2007; (4) criticism in February 2007 over changing a bulletin board; (5) alleged comments when she was ill on March 1, 2007; (6) alleged refusal to convert personal-leave days into sick-leave days at the end of March 2007; (7) May 2007 denial of opportunity to present "Congeniality Awards" to students at an award ceremony; (8) a transfer from Rowan Middle School to Brown Elementary School in May 2007; and (9) alleged denial of opportunity to make presentations to teachers at some undetermined date.

To begin, it is axiomatic that an alleged retaliatory act must occur after an employee's participation in a protected activity. Here, Plaintiff filed her Charge of Discrimination after all of the above referenced incidents. But "an informal complaint may constitute protected activity for purposes of retaliation claims." *Casna v. City of Loves Park*, 574 F.3d 420, 427 (5th Cir. 2009).

And Johnson testified that she began complaining to her superiors in October or November 2006. Def.'s Mot. [125] Ex. A, Johnson Test. 103. With the exception of the failure to train allegation, discussed below, the evidence viewed in a light most favorable to the verdict suggests that the disputed incidents occurred after the protected activity.

The main question is whether the alleged incidents constitute materially adverse employment actions.

> To constitute prohibited retaliation, an employment action must be "materially adverse," one that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." The purpose of this objective standard is "to separate significant from trivial harms" and "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."

*Stewart v. Miss. Transp. Com'n*, 586 F.3d 321, 331 (5th Cir. 2009) (alteration in original) (quoting *White*, 548 U.S. at 68). The "significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *White*, 548 U.S. at 69. Although this determination is often a question of fact, the Fifth Circuit Court of Appeals has "frequently" decided it as a matter of law. *Magiera v. City of Dallas*, 389 F. App'x 433, 437 n.3 (5th Cir. 2010) (citation omitted).

Numerous Fifth Circuit decisions have found as a matter of law that incidents similar to these fall short of establishing a materially adverse employment action. For example, in *Stewart*, the following acts were not sufficient to create a triable issue: (1) "personal items were taken from [Plaintiff's] desk"; (2) "the locks on [Plaintiff's] office had been changed and she was not allowed to close her office door"; and (3) "[Plaintiff] was chastised by superiors and ostracized by co-workers." 586 F.3d at 331–32 (holding that such claims "fall into the category of 'petty

slights, minor annoyances, and simple lack of good manners'") (citing *White*, 548 U.S. at 69). The court further found that in the context of the evidence, even the placement of the plaintiff on administrative leave for three weeks, and reassigning her upon return to "a new supervisor and given a heavier workload," did not present a materially adverse employment action because the plaintiff "suffered no adverse impact." *Id*. at 332.

Similarly, in *Peace v. Harvey*, the court found as a matter of law that the following constituted mere petty slights or minor annoyances:

> [Plaintiff] received a note detailing leave approval procedures from the Deputy Chief of Staff; she was not provided a designated seat at a ceremony for her departing general; she was assigned 'menial and degrading work' when told to work on security files and other "non-critical" tasks; she was told she could no longer park in her assigned space; and, three days before her retirement date, a superior yelled at her and told her to move out of her office.

207 F. App'x 366, 368–69 (5th Cir. 2006) (finding "these incidents are either unsupported or so 'trivial' as to fail the *Burlington Northern* standard."). So too, the *Magiera* court found that the following actions did not constitute materially adverse employment action:

> (1) [Plaintiff's] supervisors sent her home from work after she requested a control number; (2) other officers "clicked" her on the radio and refused to partner with her; (3) Internal Affairs investigated complaints lodged against her with heightened scrutiny; (4) she was treated more harshly in interviews and denied lateral transfers; (5) she was denied overtime assignments; and (6) she was denied the opportunity to serve as an FTO.

389 F. App'x at 437; *see also Mitchell v. Snow*, 326 F. App'x 852, 856 (5th Cir. 2009) (affirming district court's finding that lower-than-expected employment review "would not have dissuaded a reasonable employee from asserting discrimination"); *King v. Louisiana*, 294 F. App'x. 77, 85 (5th Cir. 2008) (holding that "allegations of unpleasant work meetings, verbal reprimands, improper work requests and unfair treatment do not constitute adverse employment actions as . . .

retaliation") (citations omitted); *Grice v. FMC Techs., Inc.*, 216 F. App'x 401, 407 (5th Cir. 2007) (holding that unjustified reprimands are considered "trivial" and not materially adverse in the retaliation context); *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 F. App'x 437, 442 (5th Cir. 2007) (holding that a written disciplinary warning for insubordination and being argumentative would not have "dissuaded a reasonable worker from making or supporting a charge of discrimination") (citation omitted).

In the present case, many of the disputed incidents, even assuming they occurred as Johnson described them, would be nothing more than petty slights that would not dissuade a reasonable worker from making a complaint. In fact, none of them had that effect on Johnson—she filed her Charge of Discrimination after the final disputed incident. *See DeHart*, 214 F. App'x at 442 (holding that reprimand would not dissuade a reasonable employee from complaining "given that several weeks later . . . a charge was filed").

But as discussed below, JMOL is denied on liability because a reasonable jury could find that Johnson's transfer was a materially adverse employment action. In terms of liability, the analysis could end with consideration of the transfer. But the Court will examine each alleged act because it has also concluded that Johnson presented no evidence of her injuries after March 1, 2007, and none of the acts occurring before that date were materially adverse.

a. Supervisor's Alleged Assault

Johnson testified that in December 2006, Winters—her supervisor and the alleged harasser in the dismissed sexual harassment claim—was speaking to her at a meeting with others and as he made his points, he "struck me on the hand." Johnson Test. 32. Later, she testified that under her "understanding of assault, if anybody touches someone without their permission, it

is an assault. And Mr. Winters assaulted me." *Id*. at 34. One of the participants in the meeting, Dorothy Huell-Foster, was asked whether Winters struck Johnson, and she responded, "Absolutely not." Pl.'s Resp. [165] Ex. 37, Huell-Foster Test. 7. Winters likewise denied the incident. Winters Test. 8. But viewed in a light most favorable to Johnson, the Court assumes Winters "struck" Johnson's hand, although the severity is not clear.

Johnson has the burden of proving that this was a materially adverse employment action. As described, the incident was a literal "slap on the wrist." The legal question is whether such conduct would dissuade a reasonable employee from making a complaint. *White*, 548 U.S. at 69. No reasonable jury could conclude that it would. In fact, it did not dissuade Johnson, who made a formal EEOC charge months after this occurred. *See DeHart*, 214 F. App'x at 442 (finding that action was not materially adverse in part because it did not deter the plaintiff's subsequent protected activity). Instead, the conduct falls "into the category of petty slights, minor annoyances, and simple lack of good manners that the Supreme Court has recognized are not actionable retaliatory conduct. Title VII 'does not set forth a general civility code for the American workplace." *Stewart*, 586 F.3d at 332 (quoting *White*, 548 U.S. at 68). The Court finds as a matter of law that this incident was not materially adverse.

b. Training

Johnson contends that JPS refused to send her to "CORE" training. The training consisted of 3 one-day programs, and the record is undisputed that Johnson arrived at Rowan Middle School after the first two days had been completed. Johnson testified that she was told that because she "missed the other two trainings, that it was too late for [her] to have those trainings done." Johnson Test. 150. Johnson then offered Exhibit P-61 as proof of that the

training was conducted and that she was wrongfully denied the right to attend. But P-61 is a letter to another teacher announcing "Day 3 of CORE training." *Id*.

Another problem is that Johnson never established when exactly the decision to deny CORE training occurred and whether it was after she engaged in a protected activity. And even when viewed in a light most favorable to Johnson, she was denied a one-day training session, but she failed to offer evidence demonstrating how this lack of training affected her salary or any other aspect of her position. According to Johnson, she requested the training "simply because it would have made me a better practitioner." *Id*. at 19. The Fifth Circuit Court of Appeals ruled that a similar claim of denied training was not material as a matter of law. *See Earle v. Aramark Corp*., 247 F. App'x 519, 524 (5th Cir. 2007) (finding the following actions were not materially adverse: excluding plaintiff from a training lunch; subjecting her to disciplinary write-ups; and micro-managing her performance). So too, this incident was not materially adverse.

c. Denied Opportunity to Make Unannounced Visits

Johnson contends that the following e-mail from an assistant principal was a retaliatory effort to preclude her from making unannounced visits to classrooms:

> This is just a follow-up note *for you all*. Make sure that all correspondence is carried out via e-mail. That means requests for modeling sessions, conferences, meetings, suggestions, implementation strategies, et cetera. This is a vital element to ensuring that all that we are required to do is known by all parties. Thank you for your assistance with completing this task.

Ex. P-55 (emphasis added). Assuming that the e-mail was directed exclusively to Johnson and in fact precluded unannounced visits, the action has no greater potential to dissuade than actions such as the "menial and degrading work" assigned in *Peace*, 207 F. App'x at 368–69.

d. Criticism at Coaches Meeting

According to Johnson, Winters harshly criticized her at a coaches meeting. But she also testified that Winters made the comments to the entire group without naming Johnson. Johnson Test. 19. She believes Winters was speaking to her because "each time he spoke, he would look up at me and look down and look up at me." *Id*. Subjective beliefs of discrimination are not sufficient proof. *Evans v. Collins*, 9 F.3d 1546, at *2 (5th Cir. 1993) (unpublished table decision). Plus, even if Winters directly addressed Johnson, it would be no more actionable than being "chastised by superiors and ostracized by co-workers" as in *Stewart*. 586 F.3d at 332; *see also DeHart*, 214 F. App'x at 442 (holding that written disciplinary warning for insubordination and being argumentative not materially adverse).

e. Negative Reviews

While her reviews were not what she hoped, Johnson continued to receive at least some positive feedback after she engaged in protected activity. The only performance review in the record came after the protected activity, and it gave Johnson the highest or next-highest rating in all but one reviewed area. Ex. P-18 (reflecting that Johnson received one average rating related to organizational skills). In any event, the Fifth Circuit has held that unjustified reprimands are considered "trivial" and not materially adverse in the retaliation context. *Grice*, 216 F. App'x at 407; *see also Mitchell*, 326 F. App'x at 856 (holding that lower-than-expected employment review is not materially adverse).

f. Bulletin Board Problems

Johnson contends that Winters twice retaliated against her for problems with bulletin boards in the school. The first incident occurred February 2, 2007, when the materials of an

educational bulletin board were removed shortly before a district inspection. By all accounts, Winters was very upset that the board had been taken down. Johnson called co-worker Mary Rankin Henry to testify about the issue. According to Rankin-Henry, Winters first blamed her and yelled at her in front of her students. Rankin-Henry Test. 16. Rankin-Henry felt like she was being "chastised" and was later "interrogat[ed]" by Winters in his office. *Id*. at 16–17. Rankin-Henry further stated that this was the angriest Winters had ever gotten with her although "[w]e had had a number of disagreements. You know, lack of communication. And he would get upset." *Id*. at 18. This testimony essentially creates an unrebutted record that the incident was not causally related to the protected activity. When Winters learned that Johnson was involved, he sent a security guard for her and then interrogated and allegedly threatened her job. But when Johnson explained that Winters had given her permission to change the board several months before, he retreated and apologized. Johnson Test. 23. This incident would not have dissuaded a reasonable employee and did not dissuade Johnson. *See Stewart*, 586 F.3d at 332; *DeHart*, 214 F. App'x at 442.

The second board incident occurred March 1, 2007. On that date, Johnson became ill and needed to leave work. While standing in the hall, she heard Winters state in her presence, "Peggy said that the literacy board is wrong. The word CORE is wrong and it needs to be changed." Johnson Test. 59.[2] Even assuming Winters said what Johnson claims and that he directed it to her, the comment that the word "CORE" was wrong on a literacy board and would

---

[2]While cross-examining Winters, Johnson suggested that Winters was behind her when he stated that the word "CORE" was misspelled. Winters Test. 35–36. This statement was in the form of a question from Johnson and is not evidence.

need correction is more than reasonable. The conduct falls far short of being a materially adverse employment action. *See Stewart*, 586 F.3d at 332; *DeHart*, 214 F. App'x at 442.

g. Opportunity to Make Presentations.

Johnson claims that she was not allowed to make presentations to teachers. The Court could not locate evidence indicating when this allegedly occurred. In any event, Johnson conceded on cross-examination that she "did do [her] presentations through [her] weekly meetings with the literacy department." Johnson Test. 152. She also testified that while she thought a math coach may have done one literacy presentation, "I don't think she was allowed to do them consistently." *Id*. Again, assuming this is true, it is no more serious than the employment actions in the above cited cases. *See, e.g.*, *Peace*, 207 F. App'x at 368–69 (finding that being assigned "menial and degrading work" and change in assignments not materially adverse).

h. The "Congeniality Awards"

Johnson claims that she was precluded from presenting "Congeniality Awards" at an end-of- the-year program. Johnson testified that she wanted to present awards to students who "were courteous to [her] and said good morning to [her] in the hallway." Johnson Test. 142. The request was refused, but the action is clearly trivial and would not dissuade a reasonable person from engaging in protected activity.

i. Sick Leave

At some point near the end of March, Johnson made a request to convert a personal-leave day and her birthday leave into sick leave. She states that the request was denied, and there is circumstantial evidence in Exhibit P-6 to support the claim. Denying a change in leave could

constitute a materially adverse employment action. But here, there were only two days in issue, and there is no evidence as to how the denial affected Johnson. *See Stewart*, 586 F.3d at 332 (holding that being placed on administrative leave for three weeks was not materially adverse absent proof of "adverse impact").

j. Transfer from Rowan Middle School to Brown Elementary School

There is no dispute that JPS transferred Johnson from Rowan Middle School to Brown Elementary. JPS first contends that the transfer was not materially adverse because Johnson requested the move. But the evidence on this point is disputed. While Johnson concedes that a transfer was discussed, she also testified bluntly that she did not request this transfer and told JPS she did not want it. Johnson Test. 134. She further testified that the transfer was offered more or less as an ultimatum if she wished to continue her employment with JPS. *See id*. at 135. JPS's position is plausible, but viewed in a light most favorable to the verdict, a reasonable jury could find that the transfer was involuntary. *Streber*, 221 F.3d at 721 (evidence must be viewed in a light most favorable to the verdict.)

JPS also contends that the transfer was essentially a lateral move that was not materiality adverse. Generally, "a transfer that does not involve a demotion in form or substance cannot rise to the level of a materially adverse employment action." *Sabzevari v. Reliable Life Ins. Co.*, 264 F. App'x 392, 396 (5th Cir. 2008) (quoting *Brown v. Brady*, 199 F.3d 446, 455–56 (D.C. Cir. 1999)). But even "a lateral reassignment to a position with equal pay could amount to a materially adverse action in some circumstances." *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 485 (5th Cir. 2008). Again, the evidence is mixed. JPS moved Johnson from a middle school to an elementary school where she taught children from Pre-K to the fifth grade. Johnson

Test. 91–92. According to her, she was no longer working as a literacy coach for young adults which she described as her "area of expertise." *Id*. at 138. She further contended that the move placed her in a position that required more work, reduced her independence, and forced her to incur more out-of-pocket expenses. *Id*. at 91–92. Again, JPS offered plausible versions as to all of these facts, but the jury was correctly instructed on the definition of "material" and found that a materially adverse action occurred. As stated, "[c]ontext matters." *White*, 548 U.S. at 69. Viewed in a light most favorable to the verdict, Johnson submitted sufficient evidence in the context of this case for a reasonable jury to find that the transfer was materially adverse.

k. Stealing Accusation

According to Johnson, JPS accused her of stealing school supplies in May 2007. By her account, JPS orally accused her of misappropriating $800 worth of supplies and then asked her to sign a document to that effect. Johnson Test. 144–46. The testimony is hard to follow, and the only exhibit Johnson identifies is P-70, an e-mail to "Principals" that states, "Teacher supplies . . . are custody [of] each school and should not be carried outside . . . ." Ex. P-70. Johnson states that this email was given to her and that she was accused of stealing. There is no evidence of a reprimand of any sort.

It is tempting to say that no reasonable juror could find that Johnson was actually accused of stealing. But assuming she was, the accusation—without consequence—was not materially adverse. In *Stewart*, the employee was placed on administrative leave for three weeks. While the Fifth Circuit found that such actions could be materially adverse, it concluded "that Stewart suffered no adverse impact as a result of being placed on leave." 586 F.3d at 332; *see also Magiera*, 389 F. App'x at 438 n.4 (finding that being sent home was not materially adverse

where the employee suffered "no disciplinary action"). The question may be close, but given the lack of evidence of any reprisals, *Stewart* applies.

In summary, the leave request incident and stealing accusation could present close issues in the JMOL context. But following precedent, the denial of Johnson's leave request was not materially adverse as a matter of law. Nor was the stealing accusation (assuming it occurred). Regardless, Johnson has presented sufficient evidence for a reasonable jury to conclude that her transfer was a materially adverse employment action. As such, JMOL on liability is denied.

2. Causation and Reasonableness of Damages

JPS's second and final ground for JMOL is that Johnson failed to put forth proof that her alleged injuries were causally related to retaliation or that they were reasonable. Def.'s Mem. [169] at 20.[3] JPS is correct that Johnson failed to prove injury caused by retaliation.

Plaintiff lost no wages and presented no evidence of other economic injuries. She made an improper plea for punishment in her closing statement, and referenced punitive damages in her Response. Pl.'s Resp. [165] at 51.[4] But the jury was not instructed on punitive damages; Johnson did not seek them in her Complaint [1]; and they are not recoverable against the school district. *See* 42 U.S.C. § 1981 a(b)(1) (allowing punitive damages against Title VII defendants other than governmental entities).

---

[3]The Court does not read this argument as suggesting an attack on the causation prong of Johnson's prima facie case. JPS's Reply [171] does have one sentence suggesting a broader causation argument, but the Court does not consider arguments raised for the first time in reply. *Gillaspy v. Dall. Indep. Sch. Dist.*, 278 F. App'x 307, 315 (5th Cir. 2008) (citation omitted). Moreover, the argument section of the Reply reverts to the contention that the damages were not caused by the alleged retaliation.

[4]Plaintiff's Response does not include page numbers, so the numbers correspond with the page reflected on the electronic docket.

Thus, the only damages properly presented to the jury were for mental and emotional distress.

> To recover more than nominal damages for emotional harm, a plaintiff must provide proof of actual injury resulting from the harassment. Furthermore, emotional harm will not be presumed simply because the plaintiff is a victim of discrimination. To demonstrate an actual, or specific discernable, injury, [t]he existence, nature, and severity of emotional harm must be proved.

*Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 238–39 (5th Cir. 2001) (reversing jury verdict and rendering nominal damages) (citations and quotations omitted). Significantly, the alleged injury must "result[] from" the alleged retaliation. *Id*. It is axiomatic that the injury must occur after the retaliatory acts, and in this case, Johnson offered no such evidence.

Johnson testified that on March 1, 2007, she became "gravely ill due to the amount of stress placed upon [her] by Mr. Winters and the derogatory statements made by [Director of Literacy] Ms. [Peggy] Orey." Johnson Test. 58.[5] Johnson further testified that she presented to the emergency room because she had symptoms similar to a heart attack. *Id.* at 129–30. Those symptoms included dizziness. *Id*. at 131. She then introduced her hospital discharge instructions, Ex. P-72, which provide circumstantial evidence that Johnson presented with work related stress.[6] Johnson also testified that in February 2007 she was "so stressed out." Johnson Test. 62.

---

[5]It does not appear that Johnson provided any testimony regarding Orey's derogatory comments, but Orey testified that she gave Johnson "constructive criticisms" after a "learning walk" in February 2007. Orey Test. 8. None of the exhibits address the issue, and it is not well developed in the testimony. Also, there appears to be no evidence of alleged retaliatory acts by Winters in the weeks immediately preceding Johnson's illness.

[6]The exhibit was offered during re-direct. While its admissibility in general might be questionable, the Court ruled that the door had been opened for its admission in JPS's cross. *See* Johnson Test. 171.

The problem is that all of her evidence regarding emotional distress occurred before any materially adverse employment action. The Court reviewed Johnson's testimony and exhibits and found no proof of her condition on any day other than March 1, 2007. As outlined in part II(A)(1), the transfer was the only materially adverse action, and Johnson learned of that in May 2007. Other acts that might present a closer question on materiality—such as the alleged theft—also occurred after March 1, 2007. The incidents occurring before March 1, 2007, are easily classified as petty slights that would not dissuade a reasonable employee from complaining, and did not dissuade Johnson.

Johnson's Response [169] to this portion of JPS's Motion is not helpful, offering only a few scattered references to damages. For example, Johnson observes that she called co-worker Ruthie Sayles to testify "as to the Plaintiff's medical condition." Pl.'s Resp. [165] at 15. Sayles merely confirmed that Johnson "looked like [she was] sick" on March 1, 2007. *Id*., Ex. 6, Sayles Test. 10. She did not offer testimony related to Johnson's condition at any relevant time. Next, Johnson references her medical records. Pl.'s Resp. [165] at 23, 25. But these records also relate to the March 1, 2007 incident.[7] Finally, Johnson attached a list of verdicts in amounts greater than the $50,000 awarded in this case, but the issue is causation, not quantum.

As noted, the Court is satisfied that Johnson presented a jury question on retaliation as it relates to her transfer. But the mere existence of retaliation is not sufficient to prove damages. *Flowers*, 247 F.3d at 238–39. To obtain more than nominal damages, Johnson was required to present evidence of "[t]he existence, nature, and severity of emotional harm . . . stemming from"

[7]Johnson attempted to augment the record with additional records, but they too relate to March 1, 2007, and the Court denied her motion [166] seeking leave to supplement. Order [168] March 3, 2007.

the retaliation. *Id*. (citations and punctuation omitted). Finding no such evidence in this record, the Court finds as a matter of law that Johnson is entitled to nominal damages in th amount of $1.

B. New Trial

JPS alternatively seeks a new trial under Rule 59 of the Federal Rules of Civil Procedure. Rule 59 "confirms the trial court's historic power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985). The rule does not delineate the necessary grounds to support such an order, stating only that a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Here, JPS asserts that (1) the verdict is against the weight of the evidence; (2) Johnson's cumulative misconduct tainted the verdict; and (3) the Court committed prejudicial error. The Court will address each.

1. Weight of the Evidence

"In making a determination that the verdict is against the weight of the evidence, the court weighs all the evidence and need not view it in the light most favorable to the nonmoving party." *Beckham v. La. Dock Co.*, 124 F. App'x 268, 270 (5th Cir. 2005) (quoting *Smith*, 773 F.3d at 613). "A motion for a new trial should not be granted unless the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence." *Id*. (quoting *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 838–39 (5th Cir. 2004)). Although numerous errors occurred, a new trial is not appropriate.

2. Cumulative Misconduct

Johnson committed numerous errors during the course of the trial. And while pro se parties receive some lenience with respect to their pleadings, "pro se status does not give [a party] a privilege to ignore reasonable court rules and procedures." *United States v. Jenkins*, 780 F.2d 518, 520 (5th Cir. 1986); *see also United States v. Fields*, 483 F.3d 313, 359 (5th Cir. 2007) ("A defendant proceeding pro se is expected to follow ordinary procedural rules.") (citation omitted).

JPS focuses on the following categories of information Johnson placed before the jury: (1) unsupported misrepresentations regarding witness intimidation; (2) pleas for sympathy related to pro se status; (3) appeals to local bias with favorable comments regarding the state of Mississippi; (4) violation of the "golden rule" and pleas to the "conscience of the community"; (5) reference to sexual harassment after claim was dismissed; (6) addressing counsel directly during closing; and (7) improper injection of race into closing argument. JPS cites multiple examples supporting each of these subjects.

The disputed statements were all made during Johnson's closing argument and her trial testimony. The challenged statements during her testimony generally appear to have been in her role as counsel for herself. Thus, the Court will evaluate the statements under the standards that apply to statements of counsel. When a new-trial motion is based on statements made during closing argument, the Court reviews "the entire argument . . . within the context of the court's rulings on objections, the jury charge, and any corrective measures applied by the trial court." *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1238 (5th Cir. 1985). "The improper remarks become the basis for granting a new trial when the trial judge, with the benefit of his or

her first hand knowledge of the entire proceedings, believes that the remarks infected the deliberations and conclusions of the jury." *Guar. Serv. Corp. v. Am. Emp'rs Ins. Co.*, 893 F.2d 725, 729 (5th Cir. 1990) (affirming denial of new trial). "Alleged improprieties may well be cured by an admonition or charge to the jury." *Id.* (quoting *Westbrook*, 754 F.2d at 1238).

Applying these standards to JPS's arguments, the Court finds no need to discuss topics three and seven—comments regarding the state of Mississippi and the injection of race—because JPS objected to neither, and they were not significant enough to affect JPS's substantial rights. The remaining topics warrant a closer look and will be grouped in the following headings.

a. Unsupported Misrepresentations Regarding Witness Intimidation[8]

On three occasions, Johnson informed the jury that the witnesses had been intimidated. Def.'s Mot. [126] Ex. B, Johnson Closing 5, 8, 13. Johnson first stated, "[T]hey did not support me in fear of reprisal of their jobs." *Id.* at 5. Because there was no testimony supporting the statement, the Court sustained JPS's objection and instructed the jury to "disregard that last comment." *Id.* Moments later, Johnson said, "[T]hey were afraid to come in and say that he struck me . . . for a reprisal, for fear of reprisal." *Id.* at 8. Again, the Court sustained JPS's objection and this time added in front of the jury, "Ma'am, there is no evidence of that and the jury will disregard that statement." *Id.* Despite these rulings, Johnson argued that she had proven that others might well be dissuaded to complain—an element of her claim—because "people came in and refused to testify for me." *Id.* at 13. The Court again offered a currative

[8]According to JPS, Johnson mislead the Court into believing that she had subpoenaed various JPS related witnesses. Review of the record leaves doubt whether Johnson intentionally misled the Court, as it appears that she did not understand the legal requirements for perfecting service.

instruction stating, "[T]here is no evidence in here about people having motives. . . . You can't say somebody didn't testify because of this." *Id*. Johnson expressed confusion and was invited to a sidebar where the issue was addressed in more detail. *Id*. at 13–14. She made no further statements along these lines.

"A new trial will not be granted based on trial error unless, after considering the record as a whole, the court concludes that manifest injustice will result from letting the verdict stand." *Foradori v. Harris*, 523 F.3d 477, 506 (5th Cir. 2008). After considering the record as a whole, the Court concludes that the comments did not "infect[] the deliberations and conclusions of the jury." *Guar. Serv. Corp.*, 893 F.2d at 729.

To begin with, the Court took numerous corrective measures. *See Guar. Serv. Corp.*, 893 F.2d at 729 ("Alleged improprieties may well be cured by an admonition or charge to the jury."). In addition to sustaining JPS's objections, admonishing Johnson, and instructing the jury to disregard her statements as unsupported, the Court also gave relevant instructions before, during, and after the parties' cases. The preliminary instructions included the admonitions that "[s]tatements, arguments, and questions by lawyers are not evidence" and that "testimony that the Court has excluded or told you to disregard is not evidence and must not be considered." Although not in the record presented by the parties in these motions, the Court's records reflect, as will the transcript on appeal, that it gave the following currative instruction on the first day of testimony:

> Ms. Johnson will have a chance to testify, if she wants, and at that point what she would have to say is something you can consider. But at this point nothing she says, nothing Ms. Moss says or nothing Mr. Owens says is evidence. Okay? It's not facts at this point. The facts are what come from the witness, not from the

> people asking the questions. All right? So there have been a lot of statements made that were sort of presented as facts. You can't consider any of them. Okay?

The final instructions emphasized the point:

> As stated earlier, it is your duty to determine the facts, and in so doing, you must consider only the evidence I have admitted in the case consistent with any limiting instructions I have provided.
>
> . . . .
>
> Remember that any statements, objections or arguments made by the lawyers or by Ms. Johnson other than her sworn testimony are not evidence in the case. The function of the lawyers and Ms. Johnson acting as her own counsel is to point out those things that are most helpful to their side of the case, and in so doing, to call your attention to certain facts or inferences that might otherwise escape your notice.
>
> In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case. What the lawyers and Ms. Johnson say is not binding upon you.

Ex. C-3, Final Instructions 2.

Finally, JPS objected to a statement during Johnson's closing (not part of JPS's Motion) as being contrary to the evidence. The Court could not recall whether the statement was supported and immediately gave the following instruction:

> I'm just going to remind the jury at this point none of what is taking place here, neither the objections nor the arguments, are evidence in the case. Okay? The evidence in the case, as I've said it before, came from that box or from these documents you're going to look at. All right. So if something is being said by either party that's different than the way you remember it, you go by your recollection.

Johnson Closing 17.

The Court "normally presume[s] that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability

that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (citation and quotations omitted).

> The jury system is premised on the idea that rationality and careful regard for the court's instructions will confine and exclude jurors' raw emotions. Jurors routinely serve as impartial factfinders in cases that involve sensitive, even life-and-death matters. In those cases, as in all cases, juries are presumed to follow the court's instructions.

*CSX Transp., Inc. v. Hensley*, 129 S. Ct. 2139, 2141 (2009) (citing *Greer*, 483 U.S. at 766 n. 8). There is no reason to presume that the jury in this case breached its duty to follow the Court's instructions.

Fears that the statements inflamed the jury are also dampened by the jury's question to the Court and the ultimate size of the verdict. During deliberations, the jury sent a note asking: "Do we have to decide compensatory damages?" Ex. C-6. With consent of the parties, the Court responded that the jury must consider compensatory damages, "if any," only upon finding liability. Ex. C-7. The Court will not put much weight into guessing the jury's intent from a mid-deliberation question, but the question itself does not indicate that the jury was inflamed with passion, sympathy or prejudice. Moreover, the eventual verdict, $50,000, although not causally related to the alleged retaliation, was not so excessive as to indicate inflamed passions. *C.f., DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 432 (5th Cir. 2003) ("This Court has recognized that jury verdicts improperly influenced by passion and prejudice can be indicated by their size.").

Finally, JPS made no motion for a mistrial on this or any other issue, which "suggests that any lingering prejudice from the improper comments was minimal." *United States v.*

*Diaz-Carreon*, 915 F.2d 951, 959 (5th Cir. 1990). When viewed in the full context of the case, there is no indication that these comments "infected the deliberations and conclusions of the jury." *See Guar. Serv. Corp.*, 893 F.2d at 729 (affirming denial of new trial based on three comments made by counsel where the trial court took similar ameliorative measures).[9]

b. Pleas for Sympathy Related to Pro Se Status

JPS cites a few instances through the trial where it believes Johnson tried to use her pro se status to garner sympathy. Def.'s Mem. [169] at 25–26 (citing Johnson Test. 46–47). Johnson first told the jury during her direct testimony, "I am not a lawyer, and I do and I did—I do feel so strongly about what happened to me that I was willing to defend myself in this trial. And because of the fact that I am not a lawyer . . . ." Johnson Test. 46–47. The Court sustained an objection and gave the following curative instruction:

> Ladies and gentlemen, you will have an instruction at the end of the trial, but the fact that Ms. Johnson is not represented by counsel is not relevant to whether or not she was retaliated against. You can't hold it against her that she doesn't have an attorney but it also isn't a source of sympathy. Sympathy is not something that you are allowed to consider. . . . The question is whether or not she proved the things that she has to prove at the end of the trial.

*Id.* at 47. Johnson then immediately informed the jury, "Okay . . . I was given a directive and I misunderstood what the directive was. So in my ignorance of the law, I . . . ." *Id.* The Court

[9]JPS relies in part on *Edwards v. Sears, Roebuck & Co.*, to support its argument that Johnson's comments regarding witness intimidation require a new trial. 512 F.2d 276, 286 (5th Cir. 1975). In *Edwards*, plaintiff's counsel referenced unsupported facts during closing that if believed would devastate the defense. The court granted a new trial. *Id.* But mere reference to facts not in evidence is not an automatic ticket to a new trial, and Johnson's comments—which were far more peripheral than those in *Edwards*—seemed to result from her lack of legal training rather than trickery.

immediately stopped Johnson to advise that those were the type statements she could not make. *Id*. At the conclusion of the evidence, the Court further instructed the jury as follows:

> As you know, Ms. Johnson has represented herself in this case. The Court instructs you that Plaintiff's self-representation is not a factor in your deliberations. You should neither hold it against Plaintiff nor afford her any sympathy or special consideration because she is not represented by a lawyer.

C-3 at 2.

> [I]t would also be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything other than the evidence in this case.
>
> In deciding the facts of this case, you must not be swayed by sympathy or bias or prejudice or favor as to either party. Our system of law does not permit jurors to be governed by sympathy or prejudice or public opinion. The parties expect that you will carefully and impartially consider all of the evidence in this case, follow the law as stated by the Court, and reach a just verdict regardless of the consequences.
>
> This case should be considered and decided by you as an action between persons of equal standing in the community holding the same or similar stations in life.

C-3 at 1.

While the comments were marginally improper, the Court sustained the objections, admonished Johnson before the jury, gave immediate and ample curative instructions, and provided final instructions squarely addressing the issue. *See Guar. Serv. Corp.*, 893 F.2d at 729 (affirming denial of new trial). There is nothing suggesting an "overwhelming probability" that the jury was unable to follow these instructions. *Greer*, 483 U.S. at 766 n.8 (citation and quotations omitted). And there is no indication that these relatively harmless statements "infected the deliberations and conclusions of the jury," *Guar. Serv. Corp.*, 893 F.2d at 729, especially in the absence of a mistrial motion. *Diaz-Carreon*, 915 F.2d at 959. Finally, as stated above, the jury's question and the verdict fail to reflect that the jury was somehow impassioned.

*C.f., DP Solutions, Inc.*, 353 F.3d at 432 (observing that size of verdict can reflect passion and prejudice).

c. Golden Rule, Conscience of the Community, and Pleas for Sympathy or Prejudice[10]

JPS points to a number of statements during Johnson's closing that it believes violated the "golden rule"; invoked the "conscience of the community"; or were simply pleas for sympathy and prejudice. The "golden rule" prohibits pleas for the jury to "put themselves in the shoes of the plaintiff and do unto him as they would have done unto them under similar circumstances." *Ivy v. Sec. Barge Lines, Inc.*, 585 F.2d 732, 741 (5th Cir. 1978). Such comments are "improper because [they] encourage[] the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than the evidence." *Id.* "Conscience-of-the-community" arguments are "impassioned and prejudicial pleas intended to evoke a sense of community loyalty, duty and expectation." *Westbrook*, 754 F.2d at 1239.[11] Both are improper, as are pleas for sympathy or passion.

The disputed comments include the following:

- [W]hat do you think he would do to me because I made a complaint against him of sexual harassment? Johnson Closing 8:11–12.
- Could you imagine how humiliated I was by seeing the students see me escorted by the school security officer as if I had. . . . *Id.* 16:16–18.

---

[10]Although some of these issues were raised in separate sections of JPS's Memorandum, they will be treated collectively.

[11]In the classic sense, "conscience-of-the-community" arguments are "invoked against outsiders." *Westbrook*, 754 F.2d at 1239; *see also Learmonth v. Sears, Roebuck & Co.*, 631 F.3d 724, 732 (5th Cir. 2011) ("Such an argument often invokes the parties' 'relative popular appeal, identities, or geographical locations' to prejudice the viewpoint of the jury against an out-of-state corporation.") (quoting *Guar. Serv. Corp.*, 893 F.2d at 729).

- So just think about what Mr. Winters would have done. . . . *Id.* at 19:3–4.
- Do it for all of the women, the men, the children who have had their civil rights violated. Please. Make sure that they understand that it is about respect. I beg you. *Id.* at 19:22–24.
- [I]f you had been allowed to be treated like an animal, then, yes, you would have been upset too. *Id.* at 38:1–2.
- And you're right, it is important about my daughters, my granddaughters, their daughter and your daughter. And I don't want it to happen to anybody else. *Id.* at 42:1–3.[12]
- They changed my life. And I don't want just justice for me. *Id.* at 43:6–7.
- I ask you please again show this panel, show Jackson Public Schools that yes, I am to be respected. *Id.* at 43:13–15.
- It is your decision, but I want them to be fined for what they've done. *Id.* at 44:4–5.
- Please, penalize them. Let them know that what they did is not all right. You have the power to give me the respect that they didn't. I'm asking you. Give me that respect. *Id.* at 44:14, 17.

Some of the statements clearly violated the "golden rule," others were similar in tone to "conscience-of-the-community" arguments or at least attempted to invoke sympathy and prejudice. But the issue is whether they require new trial.

As an initial point, JPS raised not one objection based on the "golden rule" or "conscience of the community" generally, and it failed to object to any of the listed statements specifically. The Fifth Circuit maintains "a healthy regard for the necessity and desirability of having errors corrected at trial." *Edwards*, 512 F.2d at 286. Accordingly, the failure to object to improper argument requires "plain-error" review, which is "confined to the exceptional case

---

[12] *See infra* part II(B)(2)(e).

where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Reese v. Mercury Marine Div. of Brunswick Corp.*, 793 F.2d 1416, 1429 (5th Cir. 1986) (quotation omitted) (finding no plain error based on isolated "conscience-of-the-community" remarks); *see also Liner v. J. B. Talley & Co.*, 618 F.2d 327, 330 (5th Cir. 1980) (observing that plain error standard applies to improper closing argument made without objection). According to the Fifth Circuit:

> Improper argument may be the basis for a new trial where no objection has been raised only where the interest of substantial justice is at stake. Absent a timely objection, reversal is generally not warranted based on counsel's improper statements alone. Rather, we consider the comments of counsel, the counsel's trial tactics as a whole, the evidence presented, and the ultimate verdict.

*Alaniz v. Zamora-Quezada*, 591 F.3d 761, 778 (5th Cir. 2009) (also referring to "substantial rights") (citations and quotations omitted).

JPS was represented by skilled counsel who were admittedly placed in a difficult position due to Johnson's lack of legal understanding. But counsel was not shy about objecting. By the Court's rough count, JPS made 11 objections during Johnson's 20-minute opening and 10 more during her closing. Johnson's testimony is likewise peppered with objections. It appeared instead that JPS made a tactical decision to let Johnson go when her emotions got the best of her and her statements were the most objectionable. Such a tactic would certainly be understandable, given JPS's expert testimony that Johnson is prone to paranoia and histrionics. In other words, the worse she behaved, the more it proved JPS's point. The Court diligently watched JPS's attorneys during such times for any hint of an objection, but they seemed content to let it go.[13]

[13] The Court obviously cannot read minds. Perhaps JPS failed to object for other tactical reasons, but as stated previously, it was not shy about objecting when it deemed necessary. And if some reluctance existed, counsel could have asked to approach and moved for mistrial.

The Court also considered stepping in at times, but concluded that JPS wanted the jury to see the behavior. Plus, the Court had already admonished Johnson before the jury, and there were a number of instances when the Court cut her off before JPS objected. Concern grew that further intervention would bolster JPS's credibility contentions. It was a fine line for all to walk, but the decision to let the jury see and hear Johnson at her worst now constitutes waiver. *See Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 376 (5th Cir. 1989) ("Bunge did not move for a mistrial because of any of the remarks complained of, but apparently chose to gamble on the verdict. Since its strategy failed, we will not now entertain Bunge's argument that Colburn's trial tactics are grounds for a new trial") (citations omitted).

And this is not a case like *Edwards*, where the failure to object was excused. There, counsel's closing intentionally referenced crippling facts that were not in evidence. Johnson's disputed comments were improper but did not appear intentional given her extreme difficulty understanding procedure. Moreover, the comments were not so prejudicial as to violate substantial justice. *See Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir. 1988) (reversing new-trial order where counsel failed to object or move for mistrial based on inflammatory and irrelevant comments of counsel during closing argument); *Skaggs v. J.H. Rose Truck Line, Inc.*, 435 F.2d 695, 696 (5th Cir. 1970) (holding that failure to object to "golden-rule" argument during closing precludes appellate review).

Finally, even if the issue had not been waived, invoking the "golden rule" or making other improper closing statements warrants a new trial "only if the opposing party shows that it was sufficiently prejudiced considering all the facts and circumstances of the case." *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 180 (5th Cir. 2005) (citing *United States v.*

*Jefferson*, 258 F.3d 405, 412 (5th Cir. 2001)). No such prejudice is apparent from these comments. First, there was no mistrial motion, which "suggests that any lingering prejudice from the improper comments was minimal." *Diaz-Carreon*, 915 F.2d at 959. Second, the Court's instructions listed above—especially the one precluding "sympathy or bias or prejudice or favor as to either party"—amply addressed the jury's duty to return a verdict based on the facts. And there is no basis to reject the presumption that the jury followed those instructions. *See Greer*, 483 U.S. at 767. Third, the verdict does not suggest jury prejudice. *See DP Solutions, Inc.*, 353 F.3d at 432. Thus, the Court cannot say that these comments violated JPS's substantial rights.

d. Reference to Sexual Harassment After Claim was Dismissed

Prior to trial, the Court entered an Order [113] granting in part JPS's Motion to exclude "[a]ny testimony related to the sexual harassment claim that has been previously dismissed by this Court." Def.'s Mot. [102] at 1. But as noted in the Order, some of the events supporting the sexual harassment claim were also cited as proof of retaliation—i.e., the evidence overlapped. Order [113] June 30, 2010, at 9. The Court therefore ruled that "while Plaintiff may not assert that she was sexually harassed, she may introduce evidence of alleged conduct that is relevant to whether she suffered an adverse employment action." *Id*. at 9–10. The Court further limited the evidence to incidents occurring after she engaged in protected activity. *Id*. at 10.

During trial, Johnson made several comments to which JPS now takes exception. But many relate to incidents of alleged harassment that Johnson relied upon to prove retaliation. Those statements were within the in-limine Order and would include, as quoted by JPS:

- And at that point, our relationship began to dwindle because he was asking me to do something that I was morally against . . . . Johnson Test. 16:11–13.

- [A]t this point I was reluctant to go to Mr. Winters' office alone so I suggested that we meet somewhere else and he said the door was going to be open. *Id.* at 30:15–18.

- I told him at that time that I was not interested in picking up a card, that I didn't want anything from him. So he continued to come up to my office. *Id.* at 36:14–16.

- [H]e continued to attempt to get me to come and retrieve this card, which he knew that I wanted no contact with him and I had made that perfectly clear. *Id.* at 37:2–4.

- And I was surprised because I didn't know anything about him or anything that he had done prior to being in the district. But [Dr. Potter] implied that he had already been in trouble. *Id.* at 62:1–3.

- I would have to go through the same agonizing, humiliating and hostile retaliatory environment that I was experiencing at Rowan. *Id.* at 112:24–113:2.

- They said that they wanted to make sure that I was away from Mr. Winters. But . . . Mr. Winters was still e-mailing me after . . . he was assigned and told not have any contact with me. *Id.* at 177:21–25.

- If you remember from the testimony which was given, even after the assaults were—attacks were lodged against me . . . . Johnson Closing 4:2–3.

- If someone goes ballistic because someone changes a board . . . . [W]hat do you think he would do to me because I made a complaint against him of sexual harassment? *Id.* at 8:4–11.

- Mr. Winters wanted control . . . . So just think about . . . what lengths would he have gone to to have these actions crafted against me. *Id.* at 19:1–5.

- How dare you do what you've done to me and then stand up in a box and put your hand on a Bible and lie? *Id.* at 19:13–14.

- As each month went on, Mr. Winters became more and more aggressive, striking me . . . . [H]e tells me, "Ms. Johnson," he comes in like the vulture that he is and he leans in and he says, . . . *Id.* at 36:6–10.

These comments are neither objectionable nor properly before the Court for JPS's failure to object.[14]

Other disputed statements are less directly related to the retaliation claim. First, JPS identifies the following statements for which no timely objection was raised:

- I was basically wooed . . . by Mr. Winters . . . . Johnson Test. 4:15.[15]
- Mr. Winters made inappropriate comments and it progressed. *Id.* at 5:15–16.
- According to the Civil Rights Act of 1964, I am entitled to work in an environment that is . . . free from any form of harassment. Unfortunately, that's not what happened to me. Johnson closing at 3:21–24.
- Before I had an opportunity to do so, something else so much more severe happened. *Id.* at 4:16–17.

JPS waived its objection to these statements, and their admission does not constitute plain error.

Second, JPS identifies other statements for which it did object, but the objections were not based on the contention that Johnson revealed details of the alleged sexual harassment:

- So even after he had been instructed to stay away from me and not have any contact, he was still emailing me and requesting me . . . Johnson Test. 178:5–8.
- Mr. Winters had been instructed to not have any contact with me. He was not to have any type of contact. *Id.* at 179:3–5.

JPS objected to the first statement as argumentative, and the objection was sustained. JPS objected that the second statement exceeded the scope of cross-examination, but the objection

[14]The Court sustained, on other grounds, objections to the comment about "agonizing, humiliating and hostile retaliatory environment," Johnson Test. 112:24–113:2, and the "vulture" comment, Johnson Closing 36:6–10.

[15]This statement did not relate to sexual harassment—Johnson was talking about her recruitment to the position at Rowan.

was overruled. *Id*. at 179:6–8. Again, JPS waived the argument it now raises with respect to these comments, the admission of which does not, in any event, constitute plain error.

That leaves only two statements for which JPS made a timely objection presumably based on the contention that Johnson was testifying regarding the alleged sexual harassment. In one, Johnson testified: "From there, I would have to just give you a—how our relationship began to go along the downside. It had a lot to do with the comments and me trying to distance myself, but it also had to do with the way Mr. Winters regarded the staff." *Id.* at 9:1–4. At sidebar, the Court learned that Johnson was referencing Winters' alleged opinion that people from Mississippi are "slow-and-lazy." *Id*. at 11:8–19. The comment had nothing to do with sexual harassment, and the Court instructed that the "slow-and-lazy" comment would not come into evidence based on Rules 402 and 403 of the Federal Rules of Evidence. *Id*. at 13:10–21.

The only remaining statement highlighted in JPS's motion was: "The harassment was still ongoing from Mr. Winters." *Id.* at 5:22–23.[16] JPS objected, but the Court overruled, stating that Johnson "had not gotten there yet," referring to the precluded subjects in the in-limine Order. *Id*. at 6:4–6. In other words, the testimony—offered to explain the protected activity—did not offer details of the sexual harassment. Nevertheless, the Court gave the following curative instruction and warning to Johnson:

> Let me just say this. Maybe this makes it easier. You're going to have an instruction at the end of the trial. This case is not about whether or not sexual harassment occurred. That's not what this case is about. The case is about whether or not JPS retaliated because she made a complaint. All right?

---

[16]The full quote shows that Johnson complained to her immediate supervisor because "the harassment was still ongoing." *Id*. at 5.

> Now, because the case is about retaliation, I have ruled that we're not going to have testimony about the specifics of the alleged harassment.
>
> And, Ms. Johnson, your testimony, as I've said before, is not going to go into the specifics or try to testify to the jury that you were harassed. You can tell them that you made a complaint of sexual harassment and how you made that complaint.

*Id.* at 6:7–20.

Thus, when JPS's Motion is striped to statements actually related to sexual harassment for which JPS offered a relevant objection, only one innocuous comment remains. Still, the Court provided another instruction at the close of evidence:

> Finally, I have instructed you that Plaintiff alleges Defendant unlawfully retaliated against her for complaining of alleged sexual harassment. The retaliation claim is the only claim for you to decide. There is no claim before you for sexual harassment, or anything else other than retaliation, and you should not concern yourself with anything other than the retaliation claim. You are not to speculate as to whether or not there is any basis as to the alleged claims of sexual harassment.

C-3 at 11.

As JPS notes, the jury asked a question during deliberations related to Question 1 on the verdict form. The verdict form asked: "Do you find that Plaintiff has proven by a preponderance of the evidence that Jackson Public School District retaliated against her for complaining of alleged sexual harassment? Yes No." Verdict [118]. The jury's note stated, "Why was the term sexual harassment used in question #1 instead of the term complaint?" C-4. JPS suggests that this question demonstrates the jury's apparent "confusion over the issue." Def.'s Mem. [169] at 30. Again, little weight is given this mid-stream inquiry, but an equally—if not more—plausible conclusion is that the term "sexual harassment" in the verdict form was confusing because the

jury fully understood that the case was not about sexual harassment. Regardless, the Court gave yet another instruction:

> The question could have asked whether JPS retaliated against Ms. Johnson for her complaint. It was unnecessary to include the words "sexual harassment" in question 1 of the verdict form. Question [1] is merely asking to you determine whether Ms. Johnson has proven each of the three essential elements of a retaliation claim by a preponderance of the evidence.
>
> As you will recall, I have instructed you that retaliation is the only claim that you are to decide. I direct you to that instruction and all of the instructions that you have been given.

C-5.

JPS agreed with the wording of the response and did not move for mistrial. The routine fact that the jury asked this question during deliberations is not sufficient to grant a new trial, as "a jury is presumed to understand a judge's answer to its question." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citation omitted).

The one remaining objected-to comment is not sufficient to grant a new trial in light of the Court's precautionary instruction, final instruction, and answer to the jury inquiry. *See Guar. Serv. Corp.*, 893 F.2d at 729 (affirming denial of new trial in light of corrective steps). There is nothing suggesting an "overwhelming probability" that the jury was unable to follow these instructions. *Greer*, 483 U.S. at 767 (citation and quotations omitted). And there is no indication that this relatively benign comment "infected the deliberations and conclusions of the jury," *Guar. Serv. Corp.*, 893 F.2d at 729, especially in the absence of a mistrial motion. *Diaz-Carreon*, 915 F.2d at 959. Finally, the jury's question and verdict fail to reflect that it was somehow confused or impassioned. *C.f., DP Solutions, Inc.*, 353 F.3d at 432.

e. Addressing Counsel Directly During Closing

JPS correctly notes that Johnson personally addressed its counsel during her closing argument. There is no doubt that the closing arguments were "testy." For example, Johnson stated—without objection—in the first portion of her closing that this case is important to her as a mother and daughter. Johnson Closing 3. This prompted JPS's counsel to make an impassioned response that he too has daughters, a wife, and a granddaughter, and that the jury should not cheapen Title VII by finding retaliation where none exists. *Id.* at 33–34. His statements apparently struck a cord with Johnson who, during rebuttal, turned to JPS's counsel and exclaimed:

> And you're right, it is important about my daughters, my granddaughters, their daughters and your daughter. And I don't want it to happen to anybody else. And we talk about what I imagine. You can't even begin to understand what I have gone through. So how dare you tell me about what I feel or what I have done? You have no clue.

*Id.* at 42. Johnson addressed counsel at other times, but this exchange was probably her most emotional.

It was clearly inappropriate for Johnson to address counsel directly, whether she knew it or not, but she was taking the bait counsel offered. Moreover, JPS never objected. As stated before, the Court paid close attention for the slightest sign of an objection from JPS's attorneys, but none was offered. Judging by everyone's demeanor at the moment, the Court concluded that JPS strategically allowed what began to look like a rant because it fit its theory—supported by expert testimony—that Johnson suffers from paranoia and is prone to histrionics. Regardless of whether the Court's assessment was correct, JPS could have objected or moved for a mistrial.

Having failed to do either, the Court will not now grant a new trial. *See Colburn*, 883 F.2d at 376 (finding that failure to object for tactical purposes waived argument for appeal).

In sum, JPS argues that the commutative effect of each category discussed above requires new trial. But for each issue JPS preserved with a timely objection, the Court sustained the objection, and gave a preliminary, curative, and final instruction. Those arguments not preserved by objection were still addressed through proper instructions. The jury is presumed to have followed the instructions. While it may be a somewhat close call, the overall circumstances of the case—as discussed above—do not warrant a new trial based on these collective statements.

C. Prejudicial Error

JPS contends that the Court erred in three ways: (1) failing to instruct the jury that the sexual-harassment claim had been dismissed; (2) restricting testimony pertaining to Brown Elementary School; and (3) giving a "mixed-motives" instruction.

1. Failing to Instruct that Sexual Harassment Claim had Been Dismissed

JPS contends, with no supporting authority, that it was unduly prejudiced by the Court's failure to give an instruction that the sexual-harassment claim had been dismissed as a matter of law. Johnson's credibility was perhaps the most crucial issue in the case. Moreover, many of the incidents of alleged harassment were also proffered in support of the retaliation claim. Had the Court instructed the jury that it dismissed the sexual-harassment claim for lack of merit—as JPS requested—it would have placed the Court in the position of commenting on Johnson's credibility, which would necessarily have bolstered JPS's argument that she is paranoid and prone to histrionics.

Finally, although the Court rejected JPS's proffered jury instruction, it gave the following instruction based on JPS's request:

> Finally, I have instructed you that Plaintiff alleges Defendant unlawfully retaliated against her for complaining of alleged sexual harassment. The retaliation claim is the only claim for you to decide. There is no claim before you for sexual harassment, or anything else other than retaliation, and you should not concern yourself with anything other than the retaliation claim. You are not to speculate as to whether or not there is any basis as to the alleged claims of sexual harassment.

C-3 at 11. There is nothing suggesting an "overwhelming probability" that the jury was unable to follow these instructions. *Greer*, 483 U.S. at 767 (citation and quotations omitted). For these reasons, and those stated in part II(B)(2)(d) of this Order, a new trial is unwarranted.

2. Restricting Testimony Pertaining to Brown Elementary

Johnson filed a separate discrimination suit against JPS related to her employment at Brown Elementary. That suit is pending before another judge, but Johnson nevertheless moved to try the cases separately. Pl.'s Mot. [99] at 1. According to JPS, the Court's ruling on the Motion established:

> [T]he cutoff date for this trial was going to be the date of the transfer. Defendant abided by that ruling and did not put forth evidence or witnesses as to what happened after the transfer. Plaintiff was allowed to make statements pertaining to her job at Brown Elementary School and how difficult it was compared to the job at Rowan Middle School. An objection from Plaintiff was sustained by the Court when defense counsel attempted to cross-examine the Plaintiff as to her testimony pertaining to transfer from Rowan to Brown.

Def.'s Mem. [169] at 31.

As an initial point, the docket reflects no response or objection from JPS regarding Johnson's motion. Even if JPS objected on record (the Court does not recall), no proffer was made, and JPS did not renew the objection to the ruling at trial. The plain-error standard

therefore applies. *United States v. Graves*, 5 F.3d 1546, 1552 (5th Cir. 1993) (holding that plain-error review applies when party fails to renew opposition to in-limine ruling or proffer the excluded evidence). To meet that standard, JPS must show error that was "so obvious that [the Court's] failure to notice it would seriously affect the fairness, integrity, or public reputation of judicial proceedings and result in a miscarriage of justice." *Id*. at 1552–53.

No such error exists. First, the Order granting Johnson's motion merely stated: "Evidence related to the second suit will not be admitted in the trial of this matter." Order [113] at 3. Second, while evidence related to alleged discriminatory acts was cut off at the transfer date, the ruling protected both parties. Clearly, Johnson could not take "two bites at the apple" by placing the alleged discrimination at Brown Elementary before the jury in this matter and then again in the second case. The ruling was therefore consistent with the spirit of JPS's Motion seeking exclusion of alleged sexual harassment that was not related to the retaliation claim. *See* Def.'s Mot. [102]. Finally, the exclusion of the alleged discrimination after the transfer did not preclude all evidence of events related to Brown Elementary. In order to explore whether the transfer constituted a materially adverse employment decision—an element of the claim—the parties would necessarily compare Johnson's positions at the two schools.

JPS points to a sustained objection regarding Brown, but that ruling was not error. On direct, Johnson testified that the Brown Elementary position was essentially a demotion. It does not appear that JPS objected to this testimony based on the now disputed in-limine Order. *See* Johnson Test. 86, 90–93. When JPS's counsel first mentioned Brown Elementary on cross, Johnson quickly objected. Out of caution, the Court granted the objection but stated, "I don't think [JPS's counsel] was going there" and then reminded the parties of the in-limine Order. *Id.*

at 132. By this, the Court meant that alleged discrimination at Brown Elementary would be excluded, but that it appeared JPS's counsel intended to broach other issues at Brown Elementary that were permissible. While the Court could have been more clear, JPS sought no clarification and proceeded.

The Court would certainly allow cross-examination (and presentation of other evidence) to rebut Johnson's testimony comparing the two jobs. In fact, it did just that. First, JPS thoroughly examined Johnson regarding the basis of the transfer. *Id*. at 132–36. Counsel then addressed Johnson's contention that the transfer affected her salary by comparing Johnson's out-of-pocket expenses at the two schools. *Id*. at 136–39. JPS also called Dr. Bonita Potter in its case-in-chief and elicited testimony comparing Johnsons' responsibilities, salaries, and fringe benefits at Rowan Middle and Brown Elementary. Potter Test. 134–37. JPS also offered exhibits on these same issues. The Court would have allowed other evidence contrasting the positions had it been offered. This suggestion of error is without merit.

3. Giving a "Mixed-Motives" Instruction

In *Smith v. Xerox Corp.*, the Fifth Circuit announced that it would apply the mixed-motives theory of liability to Title VII retaliation claims based on circumstantial evidence of retaliation. 602 F.3d 320, 332 (5th Cir. 2010). The court then provided guidance to district courts faced with the issue:

> After hearing both parties' evidence, the district court must decide what legal conclusions the evidence could reasonably support and instruct the jury accordingly. The choice of jury instructions depends simply on a determination of whether the evidence supports a finding that just one—or more than one—factor actually motivated the challenged decision. Put another way, if the district court has before it substantial evidence supporting a conclusion that both a legitimate

> and an illegitimate (i.e., more than one) motive may have played a role in the challenged employment action, the court may give a mixed-motive instruction.

*Id.* at 333 (internal punctuation, quotations, and citations omitted).

This Court cited *Smith* and gave a mixed-motives instruction because JPS offered potentially valid reasons for its decisions—including the decision to transfer Johnson—but Johnson offered evidence from which a reasonable jury could find that retaliation played a motivating factor.

JPS now raises an interesting argument, suggesting that *Smith* creates a practical problem when applied to work-place harassment. As JPS states it, "[W]here the Defendant was presented with a charge of sexual harassment by an employee against a supervisor, the employer/school district had two practical choices: 1) transfer the supervisor or 2) transfer the employee." Def.'s Mem. [169] at 31–32. JPS concludes that the "issue is not 'mixed motive'; the issue is whether the employer had a wrongful retaliatory motive in transferring the employee." *Id.*

Although intriguing, JPS did not place its argument on the record. After the charge conference, JPS was given the opportunity to make objections on the record and made no reference to the mixed-motives instruction. Plain-error review therefore applies, and JPS must show "1) that an error occurred; 2) that the error was plain, which means clear or obvious; 3) the plain error must affect substantial rights; and 4) not correcting the error would seriously impact the fairness, integrity, or public reputation of judicial proceedings." *Septimus v. Univ. of Hous.*, 399 F.3d 601, 607 (5th Cir. 2005) (citation omitted). "A reversal is appropriate when 'the charge as a whole leaves [the Court] with the substantial and ineradicable doubt whether the jury has

been properly guided in its deliberations.'" *Guerra v. N.E. Indep. Sch. Dist.*, 496 F.3d 415, 418 (5th Cir. 2007) (quoting *Septimus*, 399 F.3d at 607).

Here, JPS offered no legal authority for its argument, making it hard to find that the error was "clear or obvious." *Id*. And while JPS raises an interesting dilemma that *Smith* may create, the ultimate question in this case is whether retaliation was a motivating factor in making this particular transfer decision. The jury apparently rejected JPS's contention that the decision was free of retaliatory purpose. It also specifically found on the jury questionnaire that JPS failed to prove by a preponderance of the evidence "that it would have treated Plaintiff the same even if Plaintiff's opposition or complaint had played no role in the employment decisions." Verdict [118] at 1. Ultimately, the Court does not address whether JPS is correct because the instruction followed *Smith* and was not plain error.[17]

D. Excessive Damages

JPS's final plea for a new trial relates to Plaintiff's damages. Although the Court has granted JMOL on damages, pursuant to Rule 50(c)(1), it must state whether a new trial is appropriate in the event the Fifth Circuit reverses on that point. It is not.

The sole basis of the JMOL ruling is that Johnson's proof of her emotional distress is limited to her condition on a single day, March 1, 2007, which is before any materially adverse employment action. If the Fifth Circuit concludes that the Court erred and that some act of unlawful retaliation occurred before March 1, 2007, the proof Johnson offered is sufficient to sustain a verdict of $50,000.

---

[17]JPS focuses this argument on the transfer decision. As noted, the transfer was the only materially adverse employment action. The argument loses its punch if other actions satisfy the test.

> To be entitled to mental anguish damages, a plaintiff must show a discernible injury to the victim's mental state and submit evidence regarding the nature and extent of the alleged harm. Compensable emotional distress may manifest itself as sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self esteem, excessive fatigue, or a nervous breakdown, and physical manifestations may include ulcers, gastrointestinal disorders, hair loss, or headaches. A claimant's testimony, without more, may support an award of compensatory damages for emotional distress.

*E.E.O.C. v. WC & M Enters., Inc.*, 496 F.3d 393, 402 (5th Cir. 2007) (reversing summary judgment and holding that plaintiff's deposition testimony related to mental anguish was sufficient to support damages) (internal citations and punctuation omitted).

As stated above, Johnson testified that on March 1, 2007, she became "gravely ill due to the amount of stress." Johnson Test. 58. She related this to the alleged retaliation, and a co-worker at least confirmed that she looked ill. Sayle Test. 10. Johnson presented to the emergency room with what she described as heart-attack type symptoms. Johnson Test. 129–30. She also expressed dizziness. *Id*. at 131. The discharge instructions, Ex. P-72, provide circumstantial evidence of "anxiety and emotional distress."

Thus, Johnson introduced evidence of a physical manifestation of injury. *WC & M Enters., Inc.*, 496 F.3d at 402. Her testimony was to some extent corroborated, and her evidence is comparable to that in *WC & M Enterprises, Inc.*, where the Fifth Circuit reversed a summary-judgment finding that the plaintiff's testimony was insufficient to award damages. *Id.* Assuming causation, Johnson offered sufficient evidence of more than nominal damages.

As to the size of the verdict, the Fifth Circuit applies a "maximum recovery rule" when considering emotional-distress damages on appeal. *Thomas v. Tex. Dep't of Criminal Justice*, 297 F.3d 361, 369 (5th Cir. 2002). This approach compares "the awards for emotional distress in

similar cases" within the circuit. *Id.* at 368 (citation omitted). "Out of deference to the jury's decision, the 'maximum recovery rule' compels [the Court] to remit damages only to the maximum amount the jury could have awarded." *Id.* at 369. The Court applies a 50-percent multiplier, "or percentage enhancement, to past similar awards." *Id.*

The Fifth Circuit has affirmed several verdicts in excess of $50,000 based on alleged injuries that were comparable to those presented in this case. *See, e.g.*, *Forsyth v. City of Dall., Tex.*, 91 F.3d 769, 775 (5th Cir. 1996) (affirming award of $100,000 to officer transferred in violation of First Amendment rights premised on plaintiff's testimony describing "depression, weight loss, intestinal troubles, and marital problems"); *Williams v. Trader Publ'g Co.*, 218 F.3d 481, 486 (5th Cir. 2000) (affirming $100,000 award for emotional distress based on plaintiff's descriptions of "severe emotional distress," "sleep loss," "severe loss of weight," and "beginning smoking").

Perhaps the best comparison is the more recent opinion in *Tureaud v. Grambling State Univ.*, 294 F. App'x 909, 916 (5th Cir. 2008). There, the plaintiff testified:

> [H]is discharge [from employment] was "emotionally embarrassing" and a "painful experience" that caused him to be "deeply hurt" because (1) he had never been discharged from a previous job; (2) he was part of a tight-knit law enforcement community and his discharge was the subject of gossip; (3) he was repeatedly questioned about the discharge by his peers and subsequent employers; and (4) he was unable to obtain suitable employment after his discharge. He further testified that he gained "quite a bit" of weight, was stressed, and "had the blues" because of the discharge.

*Id.* The Fifth Circuit concluded, "Based on our survey of other cases from this circuit reviewing compensatory damages awards, and applying the 'maximum recovery rule,' we find that the jury's award of $140,000 in compensatory damages, while at the high end of the spectrum, is not

clearly excessive." *Id*. The award in the present case was less than half the amount in *Tureaud* and withstands JPS's Motion—assuming the Fifth Circuit reverses the causation ruling.

**SO ORDERED AND ADJUDGED** this the 21th day of March, 2011.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE